MARC J. SCHNEIDER (MS-1952)
**STRADLING YOCCA CARLSON & RAUTH**
A Professional Corporation
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660-6422
Telephone: (949) 725-4000
Fax: (949) 725-4100

Attorneys For Plaintiff
CANEUM, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CANEUM, INC., a Nevada Corporation,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>BARRON PARTNERS LP, a Delaware limited partnership, and Does 1 through 25, inclusive,<br><br>　　　　　Defendants. | **FIRST AMENDED COMPLAINT**<br><br>07 CIV. 7354 |

　　　　Plaintiff CANEUM, INC. ("Caneum") hereby files this First Amended Complaint against Defendants BARRON PARTNERS LP ("Barron") and Does 1 through 25, inclusive, and alleges as follows:

### INTRODUCTION

　　　　1.　　This action involves a toxic finance scheme by Barron, a hedge fund, at the expense of Caneum, a young, growing company with a thinly traded stock.

　　　　2.　　In March 2006, Caneum received investment funds from Barron in a transaction pursuant to which Barron received convertible preferred shares and warrants to purchase Caneum's common stock.

3. Prior to and during the transaction, Barron held itself out as a reputable firm with a long-term investment horizon, and not merely a speculator seeking to make a quick buck.

4. The parties understood that the principal purposes of Barron's investment were to enable Caneum to grow its business by helping fund strategic acquisitions in the IT outsourcing industry, and also to accelerate internal growth initiatives.

5. As described more fully below, just months after it invested in Caneum, Barron engaged in trading activities in Caneum stock that enabled Barron to turn a hefty profit, but stymied Caneum's efforts to grow its business. Those trading activities also resulted in several material breaches of the parties' negotiated stock purchase agreement. Barron's misconduct has had a lasting effect on the market performance of Caneum stock and has hurt Caneum's efforts to raise more capital.

6. For example, in December 2006, Barron engaged in a massive dump of its Caneum stock. Knowing that this stock dump would negatively impact Caneum's stock price, Barron then shorted Caneum's stock and used its conversion rights and warrants to try to cover its short position. Barron's conduct breached a number of provisions in the Stock Purchase Agreement, including a prohibition on shorting Caneum stock, a prohibition on trading activity by Barron that could materially alter the trading market in Caneum's stock, and a limitation on the amount of common stock Barron could control at any one time.

7. Now Barron is taking its scheme one step further by falsely claiming that Caneum has failed to meet certain earnings targets—targets that Caneum has met despite Barron's efforts to make those targets more difficult to achieve—and by asserting that Caneum must issue to Barron even more of its stock.

## THE PARTIES

8. Caneum is a corporation organized and existing under the laws of Nevada, with its principal place of business in Newport Beach, California.

9. Upon information and belief, Barron is a Delaware limited partnership, with its principal place of business in New York, New York.

10. Based upon a review of public records, Barron has only one general partner, Barron Capital Advisors, LLC. The public records do not provide any information about Barron's limited partners, if any. Upon information and belief, any limited partners Barron may have are diverse from Caneum.

11. Based upon a review of public records, Barron Capital Advisors, LLC is a Delaware limited liability company with its principal place of business in New York, New York. The public records only indicate that Mr. Andrew Worden is a principal of Barron Capital Advisors, LLC. Upon information and belief, Mr. Worden resides and is domiciled in New York. Upon information and belief, the members of Barron Capital Advisors, LLC are diverse from Caneum.

12. Caneum is unaware of the true names and capacities, whether individual, corporate, associate or otherwise of those defendants named as Does 1 through 25, inclusive, and has therefore sued these defendants by such fictitious names. Caneum will amend the complaint to show their true names and capacities when they have been ascertained.

## JURISDICTION

13. This Court has subject matter jurisdiction over this action because of the diverse citizenship of the parties and because the amount in controversy exceeds $75,000.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a). Barron resides in this district, and a substantial part of the events giving rise to the claim occurred in the district.

3

## STATEMENT OF FACTS

15. Caneum is a provider of business process and information technology outsourcing products and services across a variety of industries. A small, young company, Caneum was launched in 2003.

16. In 2004, Caneum began actively and publicly pursuing a strategy to consolidate the business process and IT outsourcing industry. Accordingly, it investigated a number of acquisition targets in the area of outsourcing. Caneum hoped that such acquisitions would complement its core business and accelerate its growth.

17. Caneum realized that it needed capital to realize its goals. Caneum hoped to achieve its industry consolidation plan both by bringing in outside investors and by using its stock as acquisition currency.

18. In December 2005, Caneum began to negotiate a deal with Barron whereby Barron would provide Caneum growth capital, and Caneum would give Barron shares in the company.

### A. The Financing Transaction

19. Upon information and belief, Barron is a private investment fund specializing in micro-cap companies.

20. In late March 2006, Caneum and Barron (collectively, the Parties") consummated a financing transaction (the "Financing Transaction") pursuant to which Barron gave Caneum $2,000,000, and Caneum gave Barron 4,000,000 shares of Caneum's convertible preferred stock, plus warrants to purchase up to a total of 8,000,000 million shares of Caneum's common stock.

21. The principal agreement reflecting the Parties' rights and duties pursuant to the Financing Transaction is the Preferred Stock Purchase Agreement between Caneum, Inc. and Barron Partners LLP, dated March 24, 2006 (the "Stock Purchase Agreement"). A copy of the Stock Purchase Agreement is attached hereto as Exhibit 1.

22. At the time of the negotiations, there were only about 5,000,000 shares of Caneum's common stock outstanding. Yet the Financing Transaction would grant Barron 4,000,000 convertible preferred shares and warrants to purchase 8,000,000 common shares. This meant Barron could potentially gain a controlling interest in the company.

23. During negotiations, Caneum sought to protect itself against a loss of control over its business while still obtaining much needed financing. In order to address Caneum's concerns about loss of control, the Parties negotiated restrictions on Barron's beneficial ownership and control in the Stock Purchase Agreement.

24. The beneficial ownership limitation appears at Section 2.1(b) of the Stock Purchase Agreement and provides:

> [T]he Company shall not effect any conversion of the Series A Preferred Stock, and [Barron] shall not be entitled to convert any portion of the Series A Preferred Stock to the extent that after giving effect to such conversion, [Barron] would beneficially own in excess of 4.9% of the number of shares of the Common Stock outstanding immediately after giving effect to such conversion.

In other words, the Stock Purchase Agreement prohibits Barron from acquiring more than 4.9% of Caneum's common stock. Section 6 of each warrant certificate issued to Barron also caps Barron's common stock ownership at 4.9%. The warrant certificates (collectively, the "Warrant Certificates") are attached hereto as Exhibits 2, 3, and 4, respectively.

25. The control limitation also appears at Section 7.5 of the Stock Purchase Agreement and simply provides that Barron "shall not exercise any Control over the [Caneum]." "Control" is then defined in Section 1.3.9 of the Stock Purchase Agreement as follows:

5

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise, including, but not limited to the following: (i) the right or power to designate one or more persons for membership to the board of directors or governing board of the entity; (ii) the ability to affect the outcome of shareholder votes; or (iii) the ability to materially affect the trading market of the entity's securities.

26.     During negotiations, Caneum also was concerned that Barron would be able to control the market price of Caneum stock. Caneum's stock had a thin trading volume, and a large shareholder could easily affect the price. In order to reduce incentives for Barron to push the share price down, Caneum negotiated a restriction on short selling. Section 7.1 of the Stock Purchase Agreement provides that Barron will not "engage, directly or indirectly, in any shorting activities involving any of [Caneum]'s Common Stock." No exceptions are provided.

27.     On March 24, 2006, the Parties consummated the Financing Transaction. At that time, Caneum's stock was trading at approximately $0.82 per share on the over-the-counter market.

28.     For a number of months after the Financing Transaction, things were going very well for Caneum. Just days after the Financing Transaction closed, in March 2006, Caneum announced an agreement to acquire TierOne Consulting, Inc. ("TierOne"), an IT services and solutions company. Later in 2006, Caneum negotiated another acquisition, of Continuum Systems Pvt. Ltd. of India ("Continuum Systems"), an off-shore outsourcing company. During 2006, Caneum added several new customers and announced record financial results. Caneum was riding high on December 27, 2006, when it announced that a consortium including Caneum had received a ten year, $5 billion government acquisition contract. At that moment, Barron saw its opportunity to carry out its toxic financing scheme.

B.  **After Caneum Announces Positive Results, Barron Breaches Its Contract By Dumping Its Stock, Taking Short Positions, And Causing A Fall In Caneum's Stock Price.**

29.  On December 27, 2006, on the heels of the good news about Caneum's new government acquisition contract, Caneum's common stock price shot up to $1.23 per share on the over-the-counter market.

30.  Upon information and belief, Barron seized this opportunity to conduct a massive sell-off of its Caneum stock at a huge profit. Knowing that its sell-off would place downward pressure on Caneum's stock price, Barron then also shorted Caneum's common stock. In fact, on December 28, 2008, Mark Jensen of Barron admitted in a telephone conversation that Barron had shorted Caneum stock. In addition, in January 2007, Caneum was repeatedly listed on the NASDAQ Regulation SHO Threshold Security List, further demonstrating that Barron was shorting Caneum's stock.

31.  On December 27, 2006, Barron converted 300,000 shares of preferred stock into common stock. On December 28, 2006, Barron exercised warrants to purchase 100,000 shares of Caneum's common stock. On December 29, 2006, Barron exercised warrants to purchase an additional 50,000 shares of Caneum common stock. By converting these preferred shares and exercising these warrants, Barron acquired or retained beneficial ownership of more than 4.9% of Caneum's outstanding common stock. In fact, in a February 2, 2007 letter to Caneum, Barron acknowledged that its common stock ownership at year end still was in excess of 4.9%.

32.  Upon information and belief, Barron's conversion of preferred stock into common stock and exercises of warrants to purchase common stock between December 27, 2006 and December 29, 2006 both supported Barron's massive sell-off of Caneum shares and was an attempt to also cover its open short position.

33.  Upon information and belief, Barron's massive sell-off and shorting of Caneum's stock during the final days of December 2006 allowed Barron to realize a hefty return on its investment. However, the sell-off predictably and materially affected the

7

trading market in Caneum's securities. Trading volume on December 27, 2006 set a historical high of over 1,500,000 shares, and trading volumes on December 28, 2006 and December 29, 2006 were also far above historical norms, at approximately 563,000 and 147,000 shares, respectively. Historical trading volumes for Caneum stock have averaged less than 50,000 shares per day. During the period since Barron's massive sell-off, average trading volumes have steadily declined, averaging less than 10,000 shares a day in June 2007.

34. The kind of harmful activities in which Barron engaged at the end of 2006 are aptly described in a February 2007 <u>Forbes</u> article about toxic financing:

> It is mighty tempting for a PIPE [private investments in public equities] buyer to double-cross the company it is investing in by shorting the company's stock and using the conversion privileges with the PIPE investment to cover its short position. That earns the investor a quick spread but wrecks the target's ability to raise more equity capital.

Nathan Vardi, *Sewer Pipes*, FORBES, Feb. 12, 2007.

35. As a result of Barron's massive sell-off and shorting of Caneum stock during the final days of 2006, Caneum's stock price actually fell over 10% from its December 26, 2006 price of $0.67, and nearly 50% from its high of $1.23 on December 27, 2006, despite the announcement of a promising new $5 billion government contract. Barron's conduct breached Section 7.1's prohibition on short sales, Section 2.1(b)'s prohibition on Barron accumulating more than 4.9% of Caneum's outstanding shares, and Section 1.3.9's prohibition on Barron affecting the trading market of Caneum's stock.

### C. Barron Discourages Caneum's Attempts To Attract Other Investors.

36. Upon information and belief, Barron has not exercised any additional warrants to purchase common stock since December 2006 although $2 million worth of warrants have been in the money throughout this time period. Thus, contrary to the intent of the Stock Purchase Agreement, Caneum has received no additional investment monies from Barron that would enable Caneum to grow its business.

37. Although Barron has shown no interest in exercising its warrants, it has denied cash to Caneum by preventing other interested investors from acquiring and exercising the warrants. Around April 2007, Caneum identified potential buyers of approximately 1,000,000 Caneum common stock warrants exercisable at $0.50 per share. Caneum believed that, if given the opportunity, the buyers would exercise the warrants and provide to Caneum much needed capital to grow its business. On or about April 18, 2007, Alan Knitowski, Caneum's Chairman, approached Andrew Worden, a Barron principal, to ask if Barron would be willing to sell its remaining warrants, and at what price. Mr. Worden ignored or rebuffed Caneum's overtures.

### D. Barron Wrongfully Demands Additional Caneum Stock.

38. Not satisfied with the hefty profits from its stock shorting and dumping activities in December 2006, or its efforts to starve Caneum of capital in 2007, Barron now seeks another illicit gain at Caneum's expense.

39. Upon information and belief, on or about July 20, 2007, Barron's Operations Manager sent an e-mail to certain of Caneum's principals demanding that Caneum issue 2,600,000 additional preferred shares to Barron. Barron asserted that Caneum had failed to meet its Adjusted EBITDA obligation, citing Section 6.15 of the Stock Purchase Agreement.

40. On or about July 20, 2007, Caneum's principal, Mr. Knitowski, sent an e-mail response indicating that Caneum had met its Adjusted EBITDA goals for the year ended December 31, 2006, and thus no shares were required to be issued to Barron.

41. On or about July 24, 2007, Caneum provided Barron with its calculation of Adjusted EBITDA for the year ended December 31, 2006. Therein, Caneum estimates that Adjusted EBITDA was 2,295,030, or $0.07 per share, well above the $0.04 target in Section 6.15.

42. On or about July 27, 2007, Barron provided Caneum with its calculation of Adjusted EBITDA for the year ended December 31, 2006. Therein, Barron estimates that Caneum's Adjusted EBITDA was negative, and thus below the $0.04 per share target.

43. The difference between Caneum's and Barron's calculations of Adjusted EBITDA lies in the Parties' determination of whether to add back certain outlays, costs, expenses, or fees associated with the acquisitions in which Caneum participated in 2006, TierOne and Continuum Systems. The Stock Purchase Agreement defines Adjusted EBITDA so as to "add back ... all cash and non-cash expenses associated with individual M&A transactions throughout the named period...." Barron is using GAAP principles in interpreting the meaning of Adjusted EBITDA, despite the Parties' agreement to exclude GAAP principles from the definition of adjusted EBITDA to allow Caneum to pursue acquisitions without hurting its ability to achieve its Adjusted EBITDA goals.

44. When the Parties negotiated the definition of Adjusted EBITDA, Barron was well aware that Caneum intended to acquire TierOne, and that Caneum was exploring the possibility of acquiring Continuum Systems or a similar company. Despite Barron's prior agreement not to penalize Caneum for pursuing its acquisition strategy by demanding additional stock, Barron now seeks to do just that. On information and belief, Barron's disingenuous contract position is just an attempt by Barron to squeeze additional

illicit gains out of Caneum, all at the expense of Caneum and in contravention of the Stock Purchase Agreement.

## COUNT ONE

### (Breach of Contract)

45. Caneum incorporates the allegations in Paragraphs 1 through 44 as though fully set forth herein.

46. Caneum has performed all conditions, covenants and promises required of it on its part in accordance with the terms and conditions of the Stock Purchase Agreement.

47. Barron has breached the Stock Purchase Agreement by engaging in the foregoing conduct.

48. Barron has also breached the implied covenant of good faith and fair dealing by engaging in the foregoing conduct.

49. Barron's breaches were material, and therefore Caneum should be relieved of any continuing obligation to perform under the agreement, including issuing any additional shares to Barron for any purpose whatsoever.

50. As a direct and proximate result of Barron's breaches of the Stock Purchase Agreement, Caneum has been damaged in an amount to be determined at trial, but in excess of $ 10,000,000, together with prejudgment interest.

51. To prevent further harm to Caneum, Barron should be permanently enjoined from shorting Caneum stock, from holding beneficial ownership of more than 4.9% of Caneum's common stock, and from exercising control over Caneum through its trading activities, pursuant to the terms of the Stock Purchase Agreement.

## COUNT TWO

### (Declaratory Relief)

52.     Caneum incorporates the allegations in Paragraphs 1 through 51 as though fully set forth herein.

53.     An actual controversy exists between the Parties, in that: (1) Caneum contends that it is not obligated to issue Barron any additional preferred shares; and (2) Barron contends that Caneum must issue to it an additional 2,600,000 shares of preferred stock.

54.     As a result of the foregoing dispute, Caneum seeks a judicial declaration that Caneum is not obligated to issue any additional shares of preferred stock to Barron.

## COUNT THREE

### (Appointment of Receiver)

55.     Caneum incorporates the allegations in Paragraphs 1 through 54 as though fully set forth herein.

56.     As set forth above, Barron has repeatedly breached the Stock Purchase Agreement.

57.     The actions of Barron have impaired and continue to impair Caneum's ability to raise capital and implement its strategic initiatives by adversely affecting the price and trading volume of Caneum stock.

58.     In light of the foregoing, Caneum respectfully requests that the Court appoint a receiver to take possession of and oversee Barron's trading activity in Caneum common stock, convertible preferred stock, and warrants to purchase common stock. The appointment of a receiver is necessary to preserve the value of Caneum stock, and to ensure that the value of Caneum stock is not diminished. The receiver's duties shall include, but not be limited to, preventing further short selling of Caneum common stock;

avoiding sudden, mass selling of Caneum stock; and preventing Barron from acquiring additional Caneum stock.

59. Caneum has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Caneum prays for the following relief:

A. On Count One, compensatory damages in an amount to be determined at trial, but in excess of $ 10,000,000, together with prejudgment interest;

B. On Count One, consequential damages in an amount to be determined at trial;

C. On Count One, injunctive relief as described above;

D. On Count Two, declaratory relief as described above;

E. On Count Three, the appointment of a receiver, as described above;

F. On all counts, attorneys' fees in favor of Caneum and against Barron;

F. On all counts, costs in favor of Caneum and against Barron;

G. On all counts, prejudgment interest; and

H. On all counts, any and all additional relief the Court shall deem just and proper.

Dated: September 12, 2007    STRADLING YOCCA CARLSON & RAUTH

By: _____
Marc J. Schneider
Attorneys for Plaintiff
CANEUM, INC.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure on all issues triable by jury.

Dated: September 12, 2007        STRADLING YOCCA CARLSON & RAUTH

                                 By: _____
                                     Marc J. Schneider
                                     Attorneys for Plaintiff
                                     CANEUM, INC.