# EXHIBIT 1

# PREFERRED STOCK PURCHASE AGREEMENT

## BETWEEN

## CANEUM, INC.

## AND

## BARRON PARTNERS LP

### DATED

### MARCH 24, 2006

# PREFERRED STOCK PURCHASE AGREEMENT

This PREFERRED STOCK PURCHASE AGREEMENT (the "Agreement") is made and entered into as of the 24th day of March, 2006 between CANEUM, INC., a corporation organized and existing under the laws of the State of Nevada ("Caneum" or the "Company") and BARRON PARTNERS LP, a Delaware limited partnership ("Investor").

## PRELIMINARY STATEMENT:

WHEREAS, the Investor wishes to purchase from the Company, upon the terms and subject to the conditions of this Agreement, four million (4,000,000) shares of preferred stock of the Company, with such preferred stock being as described in the Certificate of Designations, Rights and Preferences (the "Certificate of Designations") in substantially the form attached hereto as Exhibit A (the "Preferred Stock") for the Purchase Price set forth in Section 1.3.15 hereof. Subject to the limitations set forth herein and in the Certificate of Designation, the Preferred Stock shall be initially convertible into shares of common stock of the Company at any time at a ratio of one share of Common Stock for each share of Preferred Stock converted (the "Conversion Ratio"). In addition, the Company will issue to the Investor two Common Stock Purchase Warrants (the "Warrants") to purchase up to an additional eight million shares of common stock of the Company at the following exercise prices as stated in the Warrants: 4,000,000 shares at $0.50 per share, 2,000,000 shares at $1.00 per share, and 2,000,000 shares at $1.50 per share; and

WHEREAS, the parties intend to memorialize the purchase and sale of such Preferred Stock and the Warrants.

NOW, THEREFORE, in consideration of the mutual covenants and premises contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby conclusively acknowledged, the parties hereto, intending to be legally bound, agree as follows:

## ARTICLE I

## INCORPORATION BY REFERENCE, SUPERSEDER AND DEFINITIONS

1.1    Incorporation by Reference. The foregoing recitals and the Exhibits and Schedules attached hereto and referred to herein, are hereby acknowledged to be true and accurate, and are incorporated herein by this reference.

1.2    **Superseder**. This Agreement, to the extent that it is inconsistent with any other instrument or understanding among the parties governing the affairs of the Company, shall supersede such instrument or understanding to the fullest extent permitted by law. A copy of this Agreement shall be filed at the Company's principal office.

1.3    **Certain Definitions**. For purposes of this Agreement, the following capitalized terms shall have the following meanings (all capitalized terms used in this Agreement that are not defined in this Article 1 shall have the meanings set forth elsewhere in this Agreement):

1.3.1    "**1933 Act**" means the Securities Act of 1933, as amended.

1.3.2    "**1934 Act**" means the Securities Exchange Act of 1934, as amended.

1.3.3    "**Adjusted EBITDA**" means earnings before interest, taxes, depreciation, and amortization, and is adjusted to add back into earnings the following items: (1) non-cash stock based compensation associated with expensing stock options according to GAAP and FASB requirements for calendar years 2006 and 2007; (2) all cash and non-cash expenses associated with individual M&A transactions throughout the named period, including any non-cash charges associated with the Barron financing transaction (including, but not limited to, those that may be assessed against the convertible preferred stock and warrants and any due diligence fees) and also including the Ascendiant fees, for calendar years 2006 and 2007; and (3) the one-time $137,500 investor relations expense above and beyond normal investor relations programs recognized in calendar year 2006.

1.3.4    "**Affiliate**" means a Person or Persons directly or indirectly, through one or more intermediaries, controlling, controlled by or under common control with the Person(s) in question. The term "control," as used in the immediately preceding sentence, means, with respect to a Person that is a corporation, the right to the exercise, directly or indirectly, of more than 50 percent of the voting rights attributable to the shares of such controlled corporation and, with respect to a Person that is not a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such controlled Person.

1.3.5    "**Articles**" means the Certificate of Incorporation of the Company, as the same may be amended from time to time.

1.3.6    "**Closing**" shall mean the Closing of the transactions contemplated by this Agreement on the Closing Date.

1.3.7    "**Closing Date**" means the date on which the payment of the Purchase Price (as defined herein) by the Investor to the company is completed pursuant to this Agreement to purchase the Preferred Stock and Warrants, which shall occur on or before March 24, 2006.

1.3.8    "**Common Stock**" means shares of common stock of the Company, par value $0.001 per share.

1.3.9    "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise, including, but not limited to the following: (i) the right or power to designate one or more persons for membership to the board of directors or governing board of the entity; (ii) the ability to affect the outcome of shareholder votes; or (iii) the ability to materially affect the trading market of the entity's securities.

1.3.10    "Escrow Agreement" shall mean the Escrow Agreement among the Company, the Investor and The Law Office of Ronald N. Vance, P.C., as Escrow Agent, attached hereto as **Exhibit E.**

1.3.11    "Exempt Issuance" means the issuance of (a) shares of Common Stock, options, warrants, and shares of Common Stock issuable upon exercise of such options or warrants, to employees, officers, directors, or consultants of the Company, or others, pursuant to the Company's 2002 Stock Option/Stock Issuance Plan or similar stock or option plan duly adopted by a majority of the non-employee members of the Board of Directors of the Company or a majority of the members of a committee of non-employee directors established for such purpose, (b) securities upon the exercise of or conversion of any securities issued hereunder, including warrants and shares issued to Ascendiant Securities, LLC associated with this transaction, and (c) securities issued pursuant to acquisitions or strategic transactions, provided any such issuance shall only be to a Person which is, itself or through its subsidiaries, an operating company in a business synergistic with the business of the Company and in which the Company receives benefits in addition to the investment of funds, but shall not include a transaction in which the Company is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities.

1.3.12    "Material Adverse Effect" shall mean any adverse effect on the business, operations, properties or financial condition of the Company that is material and adverse to the Company and its subsidiaries and affiliates, taken as a whole and/or any condition, circumstance, or situation that would prohibit or otherwise materially interfere with the ability of the Company to perform any of its material obligations under this Agreement or the Registration Rights Agreement or to perform its obligations under any other material agreement.

1.3.13    "Per Share Purchase Price" means the rate of $0.50 per share of Preferred Stock.

1.3.14    "Person" means an individual, partnership, firm, limited liability company, trust, joint venture, association, corporation, or any other legal entity.

1.3.15    "Qualified Independent Director" means a person other than an officer of the Company or its subsidiaries or any other individual having a relationship which, in the opinion of the Company's board of directors, would interfere with the exercise of independent judgment in carrying out the responsibilities of a director, but excludes a director who is employed by the Company or by any parent or subsidiary of the Company or who is otherwise compensated by

the Company, or by any parent or subsidiary of the Company, except in that person's capacity as a director of the Company, or any parent or subsidiary of the Company. Notwithstanding the foregoing, a person would not be excluded from the definition of Qualified Independent Director if such person performs services for the Company on limited special projects and receives compensation for such services if a majority of the remaining Qualified Independent Directors conclude that performance of such services would not otherwise interfere with that director's exercise of independent judgment in carrying out the responsibilities of a director.

1.3.15 "Purchase Price" means the Two Million Dollars ($2,000,000) paid by the Investor to the Company for the Preferred Stock and the Warrants.

1.3.16 "Registration Rights Agreement" shall mean the registration rights agreement between the Investor and the Company attached hereto as Exhibit B.

1.3.17 "Registration Statement" shall mean the registration statement under the 1933 Act to be filed with the Securities and Exchange Commission for the registration of the Shares pursuant to the Registration Rights Agreement attached hereto as Exhibit B.

1.3.18 "SEC" means the Securities and Exchange Commission.

1.3.19 "SEC Documents" shall mean the Company's latest Form 10-K or 10-KSB as of the time in question, all Forms 10-Q or 10-QSB and 8-K filed thereafter, and the Proxy Statement for its latest fiscal year as of the time in question until such time as the Company no longer has an obligation to maintain the effectiveness of a Registration Statement as set forth in the Registration Rights Agreement.

1.3.20 "Shares" shall mean, collectively, the shares of Common Stock of the Company issued upon conversion of the Preferred Stock subscribed for hereunder and those shares of Common Stock issuable to the Investor upon exercise of the Warrants.

1.3.21 "Subsequent Financing" shall mean any offer and sale of shares of Preferred Stock or debt that is initially convertible into shares of Common Stock or otherwise senior or superior to the Preferred Stock.

1.3.22 "Transaction Documents" shall mean this Agreement, all Schedules and Exhibits attached hereto and all other documents and instruments to be executed and delivered by the parties in order to consummate the transactions contemplated hereby, including, but not limited to the documents listed in Sections 3.2 and 3.3 hereof.

1.3.23 "Warrants" shall mean the A, B, and C Common Stock Purchase Warrants in the form attached hereto Exhibits C-1, C-2, and C-3.

## ARTICLE II

### SALE AND PURCHASE OF CANEUM PREFERRED STOCK AND WARRANTS PURCHASE PRICE

2.1     <u>Sale of Preferred Stock and Issuance of Warrants.</u>

(a)     Upon the terms and subject to the conditions set forth herein, and in accordance with applicable law, the Company agrees to sell to the Investor, and the Investor agrees to purchase from the Company, on the Closing Date four million (4,000,000) shares of Preferred Stock and the Warrants for the (the "<u>Purchase Price</u>") of Two Million Dollars ($2,000,000.00). The Purchase Price shall be paid by the Investor to the Company on the Closing Date by a wire transfer or check of the Purchase Price into escrow to be held by the escrow agent pursuant to the terms of the Escrow Agreement. The Company shall cause the Preferred Stock and the Warrants to be issued to the Investor upon the release of the Purchase Price to the Company by the escrow agent pursuant to the terms of the Escrow Agreement. The Company shall register the shares of Common Stock into which the Preferred Stock is convertible pursuant to the terms and conditions of a Registration Rights Agreement attached hereto as <u>Exhibit B</u>.

(b)     Except as otherwise provided in this Agreement, each share of Preferred stock shall initially be convertible by the Investor into one (1) share of Common Stock; provided, however, that the Investor shall not be entitled to convert any portion of the Series A Preferred Stock to the extent that after giving effect to such conversion, the Investor (together with the Investor's Affiliates), would beneficially own in excess of 4.9% of the number of shares of the Common Stock outstanding immediately after giving effect to such conversion. For purposes of the foregoing sentence, the number of shares of Common Stock beneficially owned by the Investor and its Affiliates shall include the number of shares of Common Stock issuable upon conversion of the Series A Preferred Stock with respect to which the determination of such sentence is being made, but shall exclude the number of shares of Common Stock which would be issuable upon (A) conversion of the remaining, nonconverted shares of Series A Preferred Stock beneficially owned by the Investor or any of its Affiliates, so long as such shares of Series A Preferred Stock are not convertible within sixty (60) days from the date of such determination, and (B) exercise or conversion of the unexercised or nonconverted portion of any other securities of the Company (including warrants) subject to a limitation on conversion or exercise analogous to the limitation contained herein beneficially owned by the Investor or any of its Affiliates, so long as such other securities of the Company are not exercisable nor convertible within sixty (60) days from the date of such determination. For purposes of this Section 2.1(b), in determining the number of outstanding shares of Common Stock, the Investor may rely on the number of outstanding shares of Common Stock as reflected in the most recent of the following: (A) the Company's most recent quarterly reports, Form 10-Q, Form 10-QSB, Annual Reports, Form 10-K, or Form 10-KSB, as the case may be, as filed with the SEC under the Exchange Act (B) a more recent public announcement by the Company or (C) any other written notice by the Company or the Company's transfer agent setting forth the number of shares of Common Stock

outstanding. Upon the written or oral request of the Investor, the Company shall within two (2) Trading Days confirm orally and in writing to the Investor the number of shares of Common Stock then outstanding. In any case, the number of outstanding shares of Common Stock shall be determined after giving effect to the conversion or exercise of securities of the Company, including the Series A Preferred Stock, by the Holder or its affiliates since the date as of which such number of outstanding shares of Common Stock was publicly reported by the Company.

(c)    Upon execution and delivery of this Agreement and the Company's receipt of the Purchase Price from the Escrow Agent pursuant to the terms of the Escrow Agreement, the Company shall issue to the Investor the Warrants to purchase an aggregate of eight million (8,000,000) shares of Common Stock at exercise prices as stated in the Warrants, all pursuant to the terms and conditions of the forms of Warrants attached hereto as **Exhibit C-1, C-2, and C-3**; provided, however, that the Investor shall not be entitled to exercise the Warrants and receive shares of Common Stock that would result in beneficial ownership by the Investor and its affiliates of more than 4.9% of the then outstanding number of shares of Common Stock on such date as determined in Section 2.1(b) above.

2.2    **Purchase Price.** The Purchase Price shall be delivered by the Investor in the form of a check or wire transfer made payable to the Company in United States Dollars from the Investor to the Escrow Agent pursuant to the Escrow Agreement on the Closing Date.

## ARTICLE III

## CLOSING DATE AND DELIVERIES AT CLOSING

3.1    **Closing Date.** The closing of the transactions contemplated by this Agreement (the "Closing"), unless expressly determined herein, shall be held at the offices of the Company, at 5:00 P.M. local time, on the Closing Date or on such other date and at such other place as may be mutually agreed by the parties, including closing by facsimile with originals to follow.

3.2    **Deliveries by the Company.** In addition to and without limiting any other provision of this Agreement, the Company agrees to deliver, or cause to be delivered, to the Escrow Agent under the Escrow Agreement, the following:

(a)    At or prior to Closing, an executed Agreement with all exhibits and schedules attached hereto;

(b)    At or prior to Closing, executed Warrant certificates in the name of the Investor in the form attached hereto as **Exhibit C-1, C-2, and C-3**;

(c)    The executed Registration Rights Agreement;

(d)    Certifications in form and substance acceptable to the Company and the Investor from any and all brokers or agents involved in the transactions contemplated hereby as to the amount of commission or compensation payable to such broker or agent as

a result of the consummation of the transactions contemplated hereby and from the Company or Investor, as appropriate, to the effect that reasonable reserves for any other commissions or compensation that may be claimed by any broker or agent have been set aside;

(e)  [Reserved]

(f)  Evidence of approval of the Board of Directors of the Company of the Transaction Documents and the transactions contemplated hereby;

(g)  Certificate of the President and the Secretary of the Company that the Certificate of Designation has been adopted and filed;

(h)  [Reserved]

(i)  Certificates of Existence or Authority to Transact Business of the Company issued by each of the Secretaries of State for Nevada and California;

(j)  An opinion from the Company's counsel concerning the Transaction Documents and the transactions contemplated hereby in form and substance reasonably acceptable to Investor;

(k)  Stock Certificate in the name of Investor evidencing the Preferred Stock;

(l)  The executed Escrow Agreement; and

(m) Except as previously furnished to Investor or except as available on the website of the SEC, copies of all executive employment agreements, all past and present financing documentation or other documentation where stock could potentially be issued or issued as payment, all past and present litigation documents and historical financials.

(n)  Such other documents or certificates as shall be reasonably requested by Investor or its counsel.

3.3    **Deliveries by Investor**.  In addition to and without limiting any other provision of this Agreement, the Investor agrees to deliver, or cause to be delivered, to the Escrow Agent under the Escrow Agreement, the following:

(a)  A deposit in the amount of the Investor Funds;

(b)  The executed Agreement with all Exhibits and Schedules attached hereto;

(c)  The executed Registration Rights Agreement;

(d)  The executed Escrow Agreement; and

(e)  Such other documents or certificates as shall be reasonably requested by the Company or its counsel.

In the event any document provided to the other party in Paragraphs 3.2 and 3.3 herein are provided by facsimile, the party shall forward an original document to the other party within seven (7) business days.

3.4    **Further Assurances**.  The Company and the Investor shall, upon request, on or after the Closing Date, cooperate with each other (specifically, the Company shall cooperate with the Investor, and the Investor shall cooperate with the Company) by furnishing any additional information, executing and delivering any additional documents and/or other instruments and

Exhibit 1, p.22

doing any and all such things as may be reasonably required by the parties or their counsel to consummate or otherwise implement the transactions contemplated by this Agreement.

3.5     Waiver.     The Investor may waive any of the requirements of Section 3.2 of this Agreement, and the Company at its discretion may waive any of the provisions of Section 3.3 of this Agreement.  The Investor may also waive any of the requirements of the Company under the Escrow Agreement.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF
## CANEUM, INC.

The Company represents and warrants to the Investor as of the date hereof and as of Closing (which warranties and representations shall survive the Closing regardless of what examinations, inspections, audits and other investigations the Investor has heretofore made or may hereinafter make with respect to such warranties and representations) as follows:

4.1     Organization and Qualification.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada, and has the requisite corporate power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted and is duly qualified to do business in any other jurisdiction by virtue of the nature of the businesses conducted by it or the ownership or leasing of its properties, except where the failure to be so qualified will not, when taken together with all other such failures, have a Material Adverse Effect on the business, operations, properties, assets, financial condition or results of operation of the Company and its subsidiaries taken as a whole.

4.2     Articles of Incorporation and By-Laws.  The complete and correct copies of the Company's Articles and By-Laws, as amended or restated to date which have been filed with the Securities and Exchange Commission  are a complete and correct copy of such document as in effect on the date hereof and as of the Closing Date.

4.3     Capitalization.

4.3.1  The authorized and outstanding capital stock of the Company is set forth in the Company's Annual Report on Form 10-KSB, filed on March 31, 2005 with the Securities and Exchange Commission and updated on all subsequent SEC Documents.  All shares of capital stock have been duly authorized and are validly issued, and are fully paid and nonassessable, and free of preemptive rights.

4.3.2  As of the date of this Agreement, the authorized capital stock of the Company consists of 100,000,000 shares of common Stock ($.001 par value) and 20,000,000

shares of preferred stock ($.001 par value), of which approximately 5,966,611 shares of common Stock are issued and outstanding. As of Closing, following the issuance by the Company of the Preferred Stock to the Investor, the authorized capital stock of the Company will consist of 100,000,000 shares of Common Stock ($.001 par value) and 20,000,000 shares of preferred stock ($.001 par value), of which approximately 5,966,611 share of Common Stock and 4,000,000 shares of preferred stock shall be issued and outstanding. As of Closing, the Company will have no more than approximately 5,144,917 shares of Common Stock subject to outstanding options, warrants, or other instruments convertible into shares of Common Stock. All outstanding shares of capital stock have been duly authorized and are validly issued, and are fully paid and nonassessable and free of preemptive rights. All shares of capital stock described above to be issued have been duly authorized and when issued, will be validly issued, fully paid and nonassessable and free of preemptive rights. Schedule 4.3.2 hereby contains all shares and derivatives currently and potentially outstanding. The company hereby represents that any and all shares and current potentially dilutive events have been included in Schedule 4.3.2, including employment agreements, acquisition, consulting agreements, debts, payments, financing or business relationships that could be paid in equity, derivatives or resulting in additional equity issuances that could potentially occur.

     4.3.3   Except pursuant to this Agreement and as set forth in Schedule 4.3.3 hereto, and as set forth in the Company's SEC Documents, filed with the SEC, as of the date hereof and as of the Closing Date, there are not now outstanding options, warrants, rights to subscribe for, calls or commitments of any character whatsoever relating to, or securities or rights convertible into or exchangeable for, shares of any class of capital stock of the Company, or agreements, understandings or arrangements to which the Company is a party, or by which the Company is or may be bound, to issue additional shares of its capital stock or options, warrants, scrip or rights to subscribe for, calls or commitment of any character whatsoever relating to, or securities or rights convertible into or exchangeable for, any shares of any class of its capital stock. The Company agrees to inform the Investors in writing of any additional warrants granted prior to the Closing Date.

     4.3.4   The Company on the Closing Date (i) will have full right, power, and authority to sell, assign, transfer, and deliver, by reason of record and beneficial ownership, to the Investor, the Company Shares hereunder, free and clear of all liens, charges, claims, options, pledges, restrictions, and encumbrances whatsoever; and (ii) upon conversion of the Preferred Stock or exercise of the Warrants, the Investor will acquire good and marketable title to such Shares, free and clear of all liens, charges, claims, options, pledges, restrictions, and encumbrances whatsoever, except as otherwise provided in this Agreement as to the limitation on the voting rights of such Shares in certain circumstances.

4.4     Authority. The Company has all requisite corporate power and authority to execute and deliver this Agreement, the Preferred Stock, and the Warrants, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement by the Company and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action and no other corporate proceedings on the part of the Company is necessary to authorize this Agreement or to consummate the transactions contemplated hereby except as disclosed in this Agreement. This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, liquidation, conservatorship, receivership or similar laws relating to, or affecting generally the enforcement of, creditors' rights and remedies or by other equitable principles of general application.

4.5     No Conflict; Required Filings and Consents. The execution and delivery of this Agreement by the Company does not, and the performance by the Company of their respective obligations hereunder will not:   (i) conflict with or violate the Articles or By-Laws of the Company; (ii) conflict with, breach or violate any federal, state, foreign or local law, statute, ordinance, rule, regulation, order, judgment or decree (collectively, "Laws") in effect as of the date of this Agreement and applicable to the Company; or (iii) result in any breach of, constitute a default (or an event that with notice or lapse of time or both would become a default) under, give to any other entity any right of termination, amendment, acceleration or cancellation of, require payment under, or result  in the creation of a lien or encumbrance on any of the properties or assets of the Company pursuant to, any note, bond, mortgage, indenture, contract, agreement, lease, license, permit, franchise or other instrument or obligation to which the Company is a party or by the Company or any of its properties or assets is bound. Excluding from the foregoing are such violations, conflicts, breaches, defaults, terminations, accelerations, creations of liens, or incumbency that would not, in the aggregate, have a Material Adverse Effect.

4.6     Report and Financial Statements. The Company's Annual Report on Form 10-KSB, filed on March 31, 2005 with the SEC contains the audited financial statements of the Company. The Company has previously provided to the Investor the audited financial statements of the Company as of December 31, 2004 and the unaudited financial statements for the nine months ended September 30, 2005 (collectively, the "Financial Statements"). Each of the balance sheets contained in or incorporated by reference into any such Financial Statements (including the related notes and schedules thereto) fairly presented the financial position of the Company, as of its date, and each of the statements of income and changes in stockholders' equity and cash flows or equivalent statements in such Financial Statements (including any related notes and schedules thereto) fairly presents, changes in stockholders' equity and changes in cash flows, as the case may be, of the Company, for the periods to which they relate, in each case in accordance with United States generally accepted accounting principles ("U.S. GAAP") consistently applied during the periods involved, except in each case as may be noted therein, subject to normal year-

end audit adjustments in the case of unaudited statements. The books and records of the Company have been, and are being, maintained in all material respects in accordance with U.S. GAAP.

4.7   **Compliance with Applicable Laws**. The Company is not in violation of, or, to the knowledge of the Company is under investigation with respect to or has been given notice or has been charged with the violation of any Law of a governmental agency, except for violations which individually or in the aggregate do not have a Material Adverse Effect.

4.8   **Brokers**. Except for Ascendant Securities LLC, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or Commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company.

4.9   **SEC Documents**. The Company acknowledges that the Company is a publicly held company and has made available to the Investor after demand true and complete copies of any requested SEC Documents. The Company has registered its Common Stock pursuant to Section 12(g) of the 1934 Act, and the Common Stock is quoted on the OTC Bulletin Board. The Company has received no notice, either oral or written, with respect to the continued quotation or trading of the Common Stock on the OTC Bulletin Board. The Company has not provided to the Investor any information that, according to applicable law, rule or regulation, should have been disclosed publicly prior to the date hereof by the Company, but which has not been so disclosed. As of their respective dates, the SEC Documents complied in all material respects with the requirements of the 1934 Act, and rules and regulations of the SEC promulgated thereunder and the SEC Documents did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

4.10   **Litigation**. To the knowledge of the Company, no litigation, claim, or other proceeding before any court or governmental agency is pending or to the knowledge of the Company, threatened against the Company, the prosecution or outcome of which may have a Material Adverse Effect.

4.11   **Exemption from Registration.** Subject to the accuracy of the Investor's representations in Article V, except as required pursuant to the Registration Rights Agreement, the sale of the Preferred Stock and Warrants by the Company to the Investor will not require registration under the 1933 Act, but may require registration under New York state securities law if applicable to the Investor. When validly converted in accordance with the terms of the Preferred Stock, and upon exercise of the Warrants in accordance with their terms, the Shares underlying the Preferred Stock and the Warrants will be duly and validly issued, fully paid, and nonassessable. The Company is issuing the Preferred Stock and the Warrants in accordance with and in reliance upon the exemption from securities registration afforded, inter alia, by Rule 506 under Regulation D as promulgated by the SEC under the 1933 Act, and/or Section 4(2) or Section 4(6)

of the 1933 Act; provided, however, that certain filings and registrations may be required under state securities "blue sky" laws depending upon the residency of the Investor.

4.12    <u>No General Solicitation or Advertising in Regard to this Transaction</u>. Neither the Company nor any of its affiliates nor, to the knowledge of the Company, any Person acting on its or their behalf (i) has conducted or will conduct any general solicitation (as that term is used in Rule 502(c) of Regulation D as promulgated by the SEC under the 1933 Act) or general advertising with respect to the sale of the Preferred Stock or Warrants, or (ii) made any offers or sales of any security or solicited any offers to buy any security under any circumstances that would require registration of the Preferred Stock or Warrants, under the 1933 Act, except as required herein.

4.13    <u>No Material Adverse Effect</u>. Except as set forth in Schedule 4.13 attached hereto, since September 30, 2005, no event or circumstance resulting in a Material Adverse Effect has occurred or exists with respect to the Company. No material supplier or customer has given notice, oral or written, that it intends to cease or reduce the volume of its business with the Company from historical levels. Since September 30, 2005, no event or circumstance has occurred or exists with respect to the Company or its businesses, properties, prospects, operations or financial condition, that, under any applicable law, rule or regulation, requires public disclosure or announcement prior to the date hereof by the Company but which has not been so publicly announced or disclosed in writing to the Investor.

4.14    [RESERVED]

4.15    <u>Internal Controls And Procedures</u>. The Company maintains books and records and internal accounting controls which provide reasonable assurance that (i) all transactions to which the Company or any subsidiary is a party or by which its properties are bound are executed with management's authorization; (ii) the recorded accounting of the Company's consolidated assets is compared with existing assets at regular intervals; (iii) access to the Company's consolidated assets is permitted only in accordance with management's authorization; and (iv) all transactions to which the Company or any subsidiary is a party or by which its properties are bound are recorded as necessary to permit preparation of the financial statements of the Company in accordance with U.S. GAAP.

4.16    <u>Full Disclosure</u>. No representation or warranty made by the Company in this Agreement and no certificate or document furnished or to be furnished to the Investor pursuant to this Agreement contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading.

# ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF THE INVESTORS

The Investor represents and warrants to the Company that:

5.1    <u>Organization and Standing of the Investor</u>. The Investor is a limited partnership duly formed, validly existing and in good standing under the laws of the State of Delaware. The state in which any offer to purchase shares hereunder was made or accepted by such Investor is the state shown as such Investor's address. The Investor was not formed for the purpose of investing solely in the Preferred Stock, the Warrants or the shares of Common Stock which are the subject of this Agreement.

5.2    <u>Authorization and Power</u>. The Investor has the requisite power and authority to enter into and perform this Agreement and to purchase the securities being sold to it hereunder. The execution, delivery and performance of this Agreement by the Investor and the consummation by the Investor of the transactions contemplated hereby have been duly authorized by all necessary partnership action where appropriate. This Agreement and the Registration Rights Agreement have been duly executed and delivered by the Investor and at the Closing shall constitute valid and binding obligations of the Investor enforceable against the Investor in accordance with their terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, liquidation, conservatorship, receivership or similar laws relating to, or affecting generally the enforcement of, creditors' rights and remedies or by other equitable principles of general application.

5.3    <u>No Conflicts</u>. The execution, delivery and performance of this Agreement and the consummation by the Investor of the transactions contemplated hereby or relating hereto do not and will not (i) result in a violation of such Investor's charter documents or bylaws where appropriate or (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of any agreement, indenture or instrument to which the Investor is a party, or result in a violation of any law, rule, or regulation, or any order, judgment or decree of any court or governmental agency applicable to the Investor or its properties (except for such conflicts, defaults and violations as would not, individually or in the aggregate, have a Material Adverse Effect on such Investor). The Investor is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental agency in order for it to execute, deliver or perform any of such Investor's obligations under this Agreement or to purchase the securities from the Company in accordance with the terms hereof, provided that for purposes of the representation made in this sentence, the Investor is assuming and relying upon the accuracy of the relevant representations and agreements of the Company herein.

5.4    <u>Financial Risks</u>. The Investor acknowledges that such Investor is able to bear the financial risks associated with an investment in the securities being purchased by the Investor

from the Company and that it has been given full access to such records of the Company and the subsidiaries and to the officers of the Company and the subsidiaries as it has deemed necessary or appropriate to conduct its due diligence investigation. The Investor is capable of evaluating the risks and merits of an investment in the securities being purchased by the Investor from the Company by virtue of its experience as an investor and its knowledge, experience, and sophistication in financial and business matters and the Investor is capable of bearing the entire loss of its investment in the securities being purchased by the Investor from the Company.

5.5    <u>Accredited Investor</u>. The Investor is (i) an "accredited investor" as that term is defined in Rule 501 of Regulation D promulgated under the 1933 Act by reason of Rule 501(a)(3) and (6), (ii) experienced in making investments of the kind described in this Agreement and the related documents, (iii) able, by reason of the business and financial experience of its officers (if an entity) and professional advisors (who are not affiliated with or compensated in any way by the Company or any of its affiliates or selling agents), to protect its own interests in connection with the transactions described in this Agreement, and the related documents, and (iv) able to afford the entire loss of its investment in the securities being purchased by the Investor from the Company.

5.6    <u>Brokers</u>. Except as set forth in Schedule 4.8, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or Commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Investor.

5.7    <u>Knowledge of Company</u>. The Investor and such Investor's advisors, if any, have been, upon request, furnished with all materials relating to the business, finances and operations of the Company and materials relating to the offer and sale of the securities being purchased by the Investor from the Company. The Investor and such Investor's advisors, if any, have been afforded the opportunity to ask questions of the Company and have received complete and satisfactory answers to any such inquiries.

5.8    <u>Risk Factors</u>. The Investor understands that such Investor's investment in the securities being purchased by the Investor from the Company involves a high degree of risk. The Investor understands that no United States federal or state agency or any other government or governmental agency has passed on or made any recommendation or endorsement of the securities being purchased by the Investor from the Company. The Investor warrants that such Investor is able to bear the complete loss of such Investor's investment in the securities being purchased by the Investor from the Company.

5.9    <u>Full Disclosure</u>. No representation or warranty made by the Investor in this Agreement and no certificate or document furnished or to be furnished to the Company pursuant to this Agreement contains or will contain any untrue statement of a material fact, or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading. Except as set forth or referred to in this Agreement, Investor does not have any agreement or understanding with any person relating to acquiring, holding, voting or disposing of any equity securities of the Company.

PREFERRED STOCK PURCHASE AGREEMENT BETWEEN
CANEUM, INC. AND BARRON PARTNERS LP
PAGE 14 OF 29

5.10   Payment of Due Diligence Expenses. At Closing the Escrow Agent shall disperse to the Investor Fifty Thousand Dollars ($50,000.00) for due diligence expenses.


# ARTICLE VI

## COVENANTS OF THE COMPANY

6.1   Registration Rights. The Company shall cause the Registration Rights Agreement to remain in full force and effect according to the provisions of the Registration Rights Agreement and the Company shall comply in all material respects with the terms thereof.

6.2   Reservation of Common Stock. As of the date hereof, the Company has reserved and the Company shall continue to reserve and keep available at all times, free of preemptive rights, shares of Common Stock for the purpose of enabling the Company to issue the shares of Common Stock underlying the Preferred Stock and Warrants.

6.3   Compliance with Laws. The Company hereby agrees to comply in all material respects with the Company's reporting, filing and other obligations under the Laws.

6.4   Exchange Act Registration. The Company (a) will continue its obligation to report to the SEC under Section 12(g) of the 1934 Act and will use its best efforts to comply in all respects with its reporting and filing obligations under the 1934 Act, and will not take any action or file any document (whether or not permitted by the 1934 Act or the rules thereunder) to terminate or suspend any such registration or to terminate or suspend its reporting and filing obligations under the 1934 until the Investors have disposed of all of their Shares.

6.5   Corporate Existence; Conflicting Agreements. The Company will take all steps necessary to preserve and continue the corporate existence of the Company. The Company shall not enter into any agreement, the terms of which agreement would restrict or impair the right or ability of the Company to perform any of its obligations under this Agreement or any of the other agreements attached as exhibits hereto.

6.6   Preferred Stock. On or prior to the Closing Date, the Company will cause to be cancelled all preferred stock in the Company with the exceptions of Preferred Stock issued to the Investor. For a period of eighteen months from the closing the Company will not issue any preferred stock of the Company with the exception of Preferred Stock issued to the Investor.

6.7   Convertible Debt. On or prior to the Closing Date, the Company will cause to be cancelled all convertible debt in the Company. For a period of eighteen months from the closing the Company will not issue any convertible debt.

6.8   Debt Limitation. Except for the proposed acquisition of Tier One Consulting, Inc. which will include first and second anniversary installment payments, and existing and future lines of

credit, the Company agrees for eighteen months after Closing not to enter into any new borrowings of more than twice as much as the sum of the Adjusted EBITDA from recurring operations over the past four quarters.

6.9   Reset Equity Deals. On or prior to the Closing Date, the Company will cause to be cancelled any and all reset features related to any shares outstanding that could result in additional shares being issued. For a period during which any of the Preferred Shares is outstanding, the Company will not enter into any transactions that have any reset features that could result in additional shares being issued.

6.10   Independent Directors.   The Company shall have caused the appointment of the majority of the board of directors to be Qualified Independent Directors before November 1, 2006. If at any time after such date, the board shall not be comprised in the majority of Qualified Independent Directors for a consecutive thirty-day period, the Company shall pay to the Investors, pro rata, as liquidated damages and not as a penalty, an amount equal to one percent (1%) of the Purchase Price, but not to exceed an aggregate of five percent (5%), for each month during which such Qualified Independent Directors do not comprise the majority of directors, payable at the end of each such calendar month in cash or Preferred Stock at the option of the Investor.   The parties agree that the only damages payable for a violation of the terms of this Agreement with respect to which liquidated damages are expressly provided shall be such liquidated damages.   Nothing shall preclude the Investor from pursuing or obtaining specific performance or other equitable relief with respect to this Agreement.   The parties hereto agree that the liquidated damages provided for in this Section 6.10 constitute a reasonable estimate of the damages that may be incurred by the Investor by reason of the failure of the Company to appoint Qualified Independent Directors in accordance with the provision hereof. The Investor shall not withhold or delay exercise of the Warrants in connection with the appointment of Qualified Independent Directors or otherwise directly or indirectly influence or mandate the appointment of persons to the Company's board of directors.

6.11   Independent Directors Become Majority of Audit and Compensation Committees. The Company will cause the appointment of a majority of Qualified Independent Directors to the audit and compensation committees of the board of directors before Closing. If at any time after Closing such Qualified Independent Directors do not compose the majority of the audit and compensation committees for a consecutive sixty-day period, the Company shall pay to the Investors, pro rata, as liquidated damages and not as a penalty, an amount equal to twelve percent (12%) of the Purchase Price per annum, payable monthly in cash or Preferred Stock at the option of the Investor.  The parties agree that the only damages payable for a violation of the terms of this Agreement with respect to which liquidated damages are expressly provided shall be such liquidated damages.  Nothing shall preclude the Investor from pursuing other remedies or obtaining specific performance or other equitable relief with respect to this Agreement.

6.12   Use of Proceeds. The Company will use the net proceeds from the sale of the Preferred Stock and the Warrants (excluding amounts paid by the Company for legal and administrative

fees in connection with the sale of such securities) for acquisition of Tier One Consulting, Inc., working capital and other acquisitions.

6.13    Right of First Refusal. Each Investor shall have the right to participate in any subsequent funding by the Company on a pro rata basis at one hundred percent (100%) of the offering price.

6.14    Conversion Ratio Adjustment. If, from the date hereof until such time as the Investor no longer holds any of the Company's Shares, the Company closes on the sale of a note or notes, shares of Common Stock, or shares of any class of Preferred Stock at a price per share of Common Stock, or with a conversion right to acquire Common Stock at a price per share of Common Stock, that is less than the Per Share Purchase Price (as adjusted to the capitalization per share as of the Closing Date, following any stock splits, stock dividends, or the like) (collectively, the "Subsequent Conversion Price"), the Company shall make a post-Closing adjustment in the Conversion Ratio so that the number of shares of Common Stock into which the Preferred Stock are convertible shall be increased proportionately to reflect the Subsequent Conversion Price after taking into account any prior conversions of the Preferred Stock and/or exercises of the Warrants. For example, if the Company closes on a sale of shares of Common Stock at $0.40 per share and the Investor tenders 100,000 shares of Preferred stock for conversion, the conversion ratio would be adjusted by a factor the numerator of which would be the Purchase Price and the denominator of which would be the Subsequent Conversion Price times the number of Preferred Shares being converted (.50/.40 x 100,000 = 125,000 shares of Preferred Stock). Notwithstanding the foregoing, this Section 6.14 shall not apply in respect of an Exempt Issuance and shall not apply if the Investor has publicly sold, directly or indirectly, any shares of Common Stock within the six (6) months immediately preceding the date otherwise triggering an adjustment pursuant to this Section 6.14.

6.15    Adjustment Based on Adjusted EBITDA. In the event the Company's Adjusted EBITDA for the year ended December 31, 2006, is less than $0.04 per share on a fully-diluted basis, then the Company shall issue to the Investor additional Preferred Shares based on the number of Preferred Shares owned by the Investor on the Calculation Date (as defined below). . If the Company's Adjusted EBITDA at year end comes in below $0.028 per share than the Company should issue an additional 1,720,000 shares of Preferred Stock. For example if the earnings are $0.038 per share (5% Decline), and the Investor owns 4,000,000 Preferred Shares, then the Company shall issue to the Investor an additional 7.17% shares of Preferred Stock or 286,667 additional Preferred Shares. In addition to any adjustment pursuant to the above portion of Section 6.15 of this Agreement, in the event the Company's Adjusted EBITDA for the year ended December 31, 2007, is less than $0.08 per share on a fully-diluted basis, then the Company shall issue to the Investor additional Preferred Shares based on the number of Preferred Shares owned by the Investor on the Calculation Date (as defined below) equal to the proportional reduction in Adjusted EBITDA. For example if the earnings are $0.076 per share (5% Decline), and the Investor owns 2,000,000 of the Preferred Shares on the Calculation Date, then the Company shall issue to the Investor an additional 7.17% shares of Preferred Stock or 143,333 additional Preferred Shares. For purposes of this Section 6.15, the Calculation Date shall

be the fifth business day following the initial filing date of the Company's Form 10-KSB. Notwithstanding the foregoing, the maximum number of additional shares of Preferred Stock issuable pursuant to this Section 6.15 shall not exceed 2,600,000 Preferred Shares. Fully-diluted Adjusted EBITDA Per Share shall be based on the number of outstanding shares of Common Stock plus all shares of Common Stock issuable upon conversion of all outstanding convertible securities and upon all outstanding warrants, options and rights, regardless of whether (i) such shares would be included in determining diluted earnings per share, (ii) such convertible securities are subject to a restriction or limitation on exercise (iii) such options are vested or not vested, (iv) such options are out of the money or in the money and (v) such options are owned by employees or non-employees. Thus, for purpose of determining fully-diluted Adjusted EBITDA per share, the four and nine tenths percent (4.9%) Limitation shall be disregarded. The additional Preferred Shares shall be issued within five business days of the audited numbers being reported to the SEC. Notwithstanding the foregoing, the parties agree that in the event a reasonable business opportunity becomes available to the Company which would have the effect of benefiting the Company, but which would cause the Company not to meet its Adjusted EBITDA obligation as set forth in this Section 6.15, the Investor and the Company shall in good faith negotiate a reasonable adjustment or waiver to the adjustment provided in this section.

6.16    **Insider Selling.** For a period of six (6) months from the Closing, no executive officer or director of the Company shall be permitted to sell any shares of Common Stock in the open market, or sell any shares in a private transaction which would permit the resale of such shares in the open market during such six-month period.

6.17    **Employment and Consulting Contracts.** For eighteen months after the Closing the Company must have a unanimous opinion from the Compensation Committee of the Board of Directors that any awards other than salary are usual, appropriate and reasonable for any officer, non-Qualified Independent Director, employee or consultant consistent with generally accepted market rates based on the experience and quality of the individual.

6.18    **Subsequent Equity Sales.** From the date hereof until such time as the Investor no longer holds any of the Company's Shares, the Company shall be prohibited from effecting or entering into an agreement to effect any Subsequent Financing involving a "**Variable Rate Transaction**" or an "**MFN Transaction**" (each as defined below). The term "**Variable Rate Transaction**" shall mean a transaction in which the Company issues or sells (i) any debt or equity securities that are convertible into, exchangeable or exercisable for, or include the right to receive additional shares of Common Stock either (A) at a conversion, exercise or exchange rate or other price that is based upon and/or varies with the trading prices of or quotations for the shares of Common Stock at any time after the initial issuance of such debt or equity securities, or (B) with a conversion, exercise or exchange price that is subject to being reset at some future date after the initial issuance of such debt or equity security or upon the occurrence of specified or contingent events directly or indirectly related to the business of the Company or the market for the Common Stock. The term "**MFN Transaction**" shall mean a transaction in which the Company issues or sells any securities in a capital raising transaction or series of related

transactions which grants to an investor the right to receive additional shares based upon future transactions of the Company on terms more favorable than those granted to such investor in such offering. Any Purchaser shall be entitled to obtain injunctive relief against the Company to preclude any such issuance, which remedy shall be in addition to any right to collect damages. Notwithstanding the foregoing, this Section 6.18 shall not apply in respect of an Exempt Issuance, except that no Variable Rate Transaction or MFN Transaction shall be an Exempt Issuance.

6.19 <u>Option Grants to Current Employees, Officers, Directors, and Consultants.</u> For a period of two years from Closing, the Company shall not issue in aggregate more than 1,000,000 additional options or warrants, or shares of common stock or common stock equivalents to any existing employees, officers, directors, or consultants of the Company as of the Closing Date, excluding existing outside legal and accounting service providers currently retained by the Company. This restriction shall not apply to any new employees, officers, directors, or consultants hired, appointed, or retained by the Company after Closing.

6.20 <u>Amendment to Certificate of Incorporation.</u> At or before the next annual meeting of the stockholders of the Company, the Board of Directors shall propose and submit to the holders of the Common Stock for approval, an amendment to the Certificate of Incorporation that provides substantially as follows:

> "The terms and conditions of any rights, options and warrants approved by the Board of Directors may provide that any or all of such terms and conditions may be waived or amended only with the consent of the holders of a designated percentage of a designated class or classes of capital stock of the Corporation (or a designated group or groups of holders within such class or classes, including but not limited to disinterested holders), and the applicable terms and conditions of any such rights, options or warrants so conditioned may not be waived or amended absent such consent.".

6.21 <u>Stock Splits</u>. All forward and reverse stock splits shall affect all equity and derivative holders proportionately.

# ARTICLE VII

## COVENANTS OF THE INVESTOR

7.1    **Compliance with Law.** The Investor's trading activities with respect to shares of the Company's Common Stock will be in compliance with all applicable state and federal securities laws, rules and regulations and rules and regulations of any public market on which the Company's Common Stock is listed. The Investor shall not engage, directly or indirectly, in any shorting activities involving any of the Company's Common Stock.

7.2    **Transfer Restrictions.** The Investor's acknowledge that (1) the Preferred Stock, Warrants and shares underlying the Preferred Stock and Warrants have not been registered under the provisions of the 1933 Act, and may not be transferred unless (A) subsequently registered thereunder or (B) the Investor shall have delivered to the Company an opinion of counsel, reasonably satisfactory in form, scope and substance to the Company, to the effect that the Preferred Stock, Warrants and shares underlying the Notes and Warrants to be sold or transferred may be sold or transferred pursuant to an exemption from such registration; and (2) any sale of the Preferred Stock, Warrants and shares underlying the Preferred Stock and Warrants made in reliance on Rule 144 promulgated under the 1933 Act may be made only in accordance with the terms of said Rule and further, if said Rule is not applicable, any resale of such securities under circumstances in which the seller, or the person through whom the sale is made, may be deemed to be an underwriter, as that term is used in the 1933 Act, may require compliance with some other exemption under the 1933 Act or the rules and regulations of the SEC thereunder.

7.3    **Restrictive Legend.** The Investor acknowledges and agrees that the Preferred Stock, the Warrants and the Shares underlying the Preferred Stock and Warrants, and, until such time as the Shares underlying the Preferred Stock and Warrants have been registered under the 1933 Act and sold in accordance with an effective Registration Statement, certificates and other instruments representing any of the Shares, shall bear a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of any such securities):

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS AND NEITHER SUCH SHARES NOR ANY INTEREST THEREIN MAY BE OFFERED, SOLD, PLEDGED, ASSIGNED OR OTHERWISE TRANSFERRED UNLESS (1) A REGISTRATION STATEMENT WITH RESPECT THERETO IS EFFECTIVE UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR (2) IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S, OR (3) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT."

7.4    **Amendment to Certificate of Incorporation.** Investor hereby agrees to vote any shares of capital stock that it may own directly or beneficially, for the amendment to the Certificate of Incorporation referenced in Section 6.20. Pending adoption of such amendment, Investor hereby agrees for itself and its successors and assigns that neither this Section 7.4 or Section 6.20 above, or any restriction on exercise of the Warrants shall be amended, modified or waived without the consent of the holders of a majority of the shares of Common Stock held by Persons who are not Affiliates of the Company, or the Investor or Affiliates of the Investor.

7.5     <u>Exercise of Control.</u> Investor shall not exercise any Control over the Company.


## ARTICLE VIII

## CONDITIONS PRECEDENT TO THE COMPANY'S OBLIGATIONS

The obligation of the Company to consummate the transactions contemplated hereby shall be subject to the fulfillment, on or prior to Closing Date, of the following conditions:

8.1     <u>No Termination</u>. This Agreement shall not have been terminated pursuant to Article X hereof.

8.2     <u>Representations True and Correct</u>. The representations and warranties of the Investor contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as if made on as of the Closing Date.

8.3     <u>Compliance with Covenants</u>. The Investor shall have performed and complied in all material respects with all covenants, agreements, and conditions required by this Agreement to be performed or complied by it prior to or at the Closing Date.

8.4     <u>No Adverse Proceedings</u>. On the Closing Date, no action or proceeding shall be pending by any public authority or individual or entity before any court or administrative body to restrain, enjoin, or otherwise prevent the consummation of this Agreement or the transactions contemplated hereby or to recover any damages or obtain other relief as a result of the transactions proposed hereby.


## ARTICLE IX

## CONDITIONS PRECEDENT TO INVESTOR'S OBLIGATIONS

The obligation of the Investors to consummate the transactions contemplated hereby shall be subject to the fulfillment, on or prior to Closing Date unless specified otherwise, of the following conditions:

9.1     <u>No Termination</u>. This Agreement shall not have been terminated pursuant to Article X hereof.

9.2    <u>Representations True and Correct</u>. The representations and warranties of the Company contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same force and effect as if made on as of the Closing Date.

9.3    <u>Compliance with Covenants</u> . The Company shall have performed and complied in all material respects with all covenants, agreements, and conditions required by this Agreement to be performed or complied by it prior to or at the Closing Date.

9.4    <u>No Adverse Proceedings</u>. On the Closing Date, no action or proceeding shall be pending by any public authority or individual or entity before any court or administrative body to restrain, enjoin, or otherwise prevent the consummation of this Agreement or the transactions contemplated hereby or to recover any damages or obtain other relief as a result of the transactions proposed hereby.


## ARTICLE X

## TERMINATION, AMENDMENT AND WAIVER

10.1    <u>Termination</u>. This Agreement may be terminated at any time prior to the Closing Date

10.1.1  by mutual written consent of the Investor and the Company;

10.1.2  by the Company upon a material breach of any representation, warranty, covenant or agreement on the part of the Investor set forth in this Agreement, or the Investor upon a material breach of any representation, warranty, covenant or agreement on the part of the Company set forth in this Agreement, or if any representation or warranty of the Company or the Investor, respectively, shall have become untrue, in either case such that any of the conditions set forth in Article VIII or Article IX hereof would not be satisfied (a "Terminating Breach"), and such breach shall, if capable of cure, not have been cured within five (5) business days after receipt by the party in breach of a notice from the non-breaching party setting forth in detail the nature of such breach.

10.2    <u>Effect of Termination</u>. Except as otherwise provided herein, in the event of the termination of this Agreement pursuant to Section 10.1 hereof, there shall be no liability on the part of the Company or the Investor or any of their respective officers, directors, agents or other representatives and all rights and obligations of any party hereto shall cease; provided that in the event of a Terminating Breach, the breaching party shall be liable to the non-breaching party for all costs and expenses incurred by the non-breaching party not to exceed $50,000.00.

10.3    <u>Amendment</u>. This Agreement may be amended by the parties hereto any time prior to the Closing Date by an instrument in writing signed by the parties hereto.

10.4   <u>Waiver</u>. At any time prior to the Closing Date, the Company or the Investor, as appropriate, may: (a) extend the time for the performance of any of the obligations or other acts of other party or; (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto which have been made to it or them; or (c) waive compliance with any of the agreements or conditions contained herein for its or their benefit.  Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party or parties to be bound hereby.

## ARTICLE XI

## GENERAL PROVISIONS

11.1   <u>Transaction Costs</u>. Except as otherwise provided herein, each of the parties shall pay all of his or its costs and expenses (including attorney fees and other legal costs and expenses and accountants' fees and other accounting costs and expenses) incurred by that party in connection with this Agreement; provided, the Company shall pay Investor such due diligence expenses as described in section 5.10.

11.2   <u>Indemnification</u>. The Investor agrees to indemnify, defend and hold the Company (following the Closing Date) and its officers and directors harmless against and in respect of any and all claims, demands, losses, costs, expenses, obligations, liabilities or damages, including interest, penalties and reasonable attorney's fees, that it shall incur or suffer, which arise out of or result from any breach of this Agreement by such Investor or failure by such Investor to perform with respect to any of its representations, warranties or covenants contained in this Agreement or in any exhibit or other instrument furnished or to be furnished under this Agreement.  The Company agrees to indemnify, defend and hold the Investor (following the Closing Date) harmless against and in respect of any and all claims, demands, losses, costs, expenses, obligations, liabilities or damages, including interest, penalties and reasonable attorney's fees, that it shall incur or suffer, which arise out of, result from or relate to any breach of this Agreement or failure by the Company to perform with respect to any of its representations, warranties or covenants contained in this Agreement or in any exhibit or other instrument furnished or to be furnished under this Agreement.  In no event shall the Company or the Investors be entitled to recover consequential or punitive damages resulting from a breach or violation of this Agreement nor shall any party have any liability hereunder in the event of gross negligence or willful misconduct of the indemnified party.  In the event of a breach of this Agreement by the Company, the Investor shall be entitled to pursue a remedy of specific performance upon tender into the Court an amount equal to the Purchase Price hereunder. The indemnification by Investor pursuant hereto shall be limited to $50,000.00 and the indemnification by the Company pursuant hereto shall be limited to $1,000,000.

11.3   Headings. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

11.4   Entire Agreement. This Agreement (together with the Schedule, Exhibits, Warrants and documents referred to herein) constitute the entire agreement of the parties and supersede all prior agreements and undertakings, both written and oral, between the parties, or any of them, with respect to the subject matter hereof.

11.5   Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been given (i) on the date they are delivered if delivered in person; (ii) on the date initially received if delivered by facsimile transmission followed by registered or certified mail confirmation; (iii) on the date delivered by an overnight courier service; or (iv) on the third business day after it is mailed by registered or certified mail, return receipt requested with postage and other fees prepaid as follows:

If to the Company:

170 Newport Center Drive
Suite 220
Newport Beach, CA 92660
Attention: Alan Knitowski, Chairman
Facsimile No.: (949) 273-4001

With a copy to:

Ronald N. Vance
Attorney at Law
57 West 200 South
Suite 310
Salt Lake City, UT 84101
Facsimile No.: (801) 359-9310

If to the Investor:

Barron Partners L.P.
c/o Barron Capital Advisors, LLC
730 Fifth Avenue, 9th Floor
New York, New York 10019
Attn: Andrew Barron Worden
Facsimile No.: (646) 607-2223

PREFERRED STOCK PURCHASE AGREEMENT BETWEEN
CANEUM, INC. AND BARRON PARTNERS LP
PAGE 24 OF 29

Exhibit 1, p.39

11.6  _Severability_. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any such term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

11.7  _Binding Effect_. All the terms and provisions of this Agreement whether so expressed or not, shall be binding upon, inure to the benefit of, and be enforceable by the parties and their respective administrators, executors, legal representatives, heirs, successors and assignees.

11.8  _Preparation of Agreement_. This Agreement shall not be construed more strongly against any party regardless of who is responsible for its preparation. The parties acknowledge each contributed and is equally responsible for its preparation.

11.9  _Governing Law_. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to applicable principles of conflicts of law.

11.10  _Jurisdiction_. This Agreement shall be exclusively governed by and construed in accordance with the laws of the State of New York. If any action is brought among the parties with respect to this Agreement or otherwise, by way of a claim or counterclaim, the parties agree that in any such action, and on all issues, the parties irrevocably waive their right to a trial by jury. Exclusive jurisdiction and venue for any such action shall be the Federal Courts serving the State of New York. In the event suit or action is brought by any party under this Agreement to enforce any of its terms, or in any appeal therefrom, it is agreed that the prevailing party shall be entitled to reasonable attorneys fees to be fixed by the arbitrator, trial court, and/or appellate court.

11.11  _Preparation and Filing of Securities and Exchange Commission filings_. The Investor shall reasonably assist and cooperate with the Company in the preparation of all filings with the SEC after the Closing Date due after the Closing Date.

11.12  _Further Assurances, Cooperation_. Each party shall, upon reasonable request by the other party, execute and deliver any additional documents necessary or desirable to complete the transactions herein pursuant to and in the manner contemplated by this Agreement. The parties hereto agree to cooperate and use their respective best efforts to consummate the transactions contemplated by this Agreement.

11.13  _Survival_. The representations, warranties, covenants and agreements made herein shall survive the Closing of the transaction contemplated hereby.

11.14 <u>Third Parties</u>. Except as disclosed in this Agreement, nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties hereto and their respective administrators, executors, legal representatives, heirs, successors and assignees. Nothing in this Agreement is intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third persons any right of subrogation or action over or against any party to this Agreement.

11.15 <u>Failure or Indulgence Not Waiver; Remedies Cumulative</u>. No failure or delay on the part of any party hereto in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any breach of any representation, warranty, covenant or agreement herein, nor shall nay single or partial exercise of any such right preclude other or further exercise thereof or of any other right. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

11.16 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. A facsimile transmission of this signed Agreement shall be legal and binding on all parties hereto.

[SIGNATURES ON FOLLOWING PAGE]

PREFERRED STOCK PURCHASE AGREEMENT BETWEEN
CANEUM, INC. AND BARRON PARTNERS LP
PAGE 26 OF 29

IN WITNESS WHEREOF, the Investors and the Company have as of the date first written above executed this Agreement.

THE COMPANY:

CANEUM, INC.

By: SUKHBIR S. MUDAN
Title: PRESIDENT

INVESTOR:

BARRON PARTNERS LP
By: Barron Capital Advisors, LLC, its General Partners

_____
Andrew Barron Worden
President
730 Fifth Avenue, 9th Floor
New York NY 10019

PREFERRED STOCK PURCHASE AGREEMENT BETWEEN
CANEUM, INC. AND BARRON PARTNERS LP
PAGE 27 OF 29

Schedule A

| NAME AND ADDRESS | AMOUNT OF INVESTMENT | NUMBER OF SHARES OF COMMON STOCK INTO WHICH PREFERRED STOCK IS CONVERTIBLE | NUMBER OF SHARES UNDERLYING WARRANTS |
|---|---|---|---|
| Barron Partners LP<br>730 Fifth Avenue, 9th Floor<br>New York, New York 10019<br>Attn: Andrew Barron Worden | $2,000,000 | 4,000,000 | 8,000,000 |

PREFERRED STOCK PURCHASE AGREEMENT BETWEEN
CANEUM, INC. AND BARRON PARTNERS LP
PAGE 28 OF 29

### Schedule 4.3.2 – Capitalization

Total Common Shares Outstanding:                    5,966,611

Total Preferred Shares Outstanding:                      -0-

Total Derivatives Outstanding:              See Attachment 1

Current Potentially Dilutive Events:        See Attachment 2

## Caneum Convertible Securities

### Options

#### Plan Grants for 2003

| Name & Grant Date | Granted Number of Options | Granted Number of Warrants | Incent./ Non-Qual | Vesting Schedule | Exercise Price | Expiration Date | Vested Options | Unvested Options | Lapsed/ Cancelled Options | Exercised Options |
|---|---|---|---|---|---|---|---|---|---|---|
| **August 14, 2003** | | | | | | | | | | |
| Alan Knitowski | 1,000,000 | | Incentive | 1 | $ 0.55 | 8/14/13 | 1,000,000 | 0 | 0 | 275,000 |
| Suki Mudan | 1,000,000 | | Incentive | 1 | $ 0.55 | 8/14/13 | 1,000,000 | 0 | 0 | 45,454 |
| Robert F. Mitro | 750,000 | | Incentive | 1 | $ 0.55 | 8/14/13 | 750,000 | 0 | 0 | |
| Jason Daggett | 55,000 | | Non-Stat | 2 | $ 0.50 | 8/14/13 | 55,000 | 0 | 0 | |
| Avtar Ranshi | 45,000 | | Non-Stat | 2 | $ 0.50 | 8/14/13 | 45,000 | 0 | 0 | 45,000 |
| **October 28, 2003** | | | | | | | | | | |
| Luan Dang | 37,500 | | Non-Stat | 3 | $ 0.75 | 10/28/13 | 18,750 | 0 | 18,750 | |
| Cygni Capital, LLC | 150,000 | | Non-Stat | 4 | $ 0.75 | 10/28/13 | 112,500 | 0 | 37,500 | |

#### Plan Grants for 2004

| Name & Grant Date | Granted Number of Options | Granted Number of Warrants | Incent./ Non-Qual | Vesting Schedule | Exercise Price | Expiration Date | Vested Options | Unvested Options | Lapsed/ Cancelled Options | Exercised Options |
|---|---|---|---|---|---|---|---|---|---|---|
| **March 17, 2004** | | | | | | | | | | |
| Gary Allhusen | 500,000 | | Incentive | 5 | $ 0.75 | 3/17/14 | 500,000 | 0 | 0 | |
| Gary Allhusen | 250,000 | | Incentive | 6 | $ 0.75 | 3/17/14 | 131,250 | 118,750 | 0 | |
| **April 28, 2004** | | | | | | | | | | |
| Brittany Mason | 5,000 | | Incentive | 2 | $ 0.75 | 4/28/14 | 5,000 | 0 | 0 | |
| **May 28, 2004** | | | | | | | | | | |
| Eric C. Bronk | 100,000 | | Non-Stat | 7 | $ 0.75 | 5/28/14 | 100,000 | 0 | 0 | |
| **July 28, 2004** | | | | | | | | | | |
| Douglas Wadkins | 50,000 | | Non-Stat | 2 | $ 3.00 | 7/28/14 | 37,500 | 0 | 12,500 | |
| **August 14, 2004** | | | | | | | | | | |
| Avtar Ranshi | 50,000 | | Non-Stat | 2 | $ 2.40 | 7/28/14 | 50,000 | 0 | 0 | |
| **October 26, 2004** | | | | | | | | | | |
| Brittany Mason | 80,000 | | Incentive | 10 | $ 2.50 | 10/28/14 | 0 | 80,000 | 0 | |

#### Plan Grants for 2005

| Name & Grant Date | Granted Number of Options | Granted Number of Warrants | Incent./ Non-Qual | Vesting Schedule | Exercise Price | Expiration Date | Vested Options | Unvested Options | Lapsed/ Cancelled Options | Exercised Options |
|---|---|---|---|---|---|---|---|---|---|---|
| **April 11, 2005** | | | | | | | | | | |
| Andy Miller | 250,000 | | Incentive | 13 | $ 1.58 | 4/11/15 | 118,585 | 131,415 | 0 | |
| Andy Miller | 100,000 | | Incentive | 12 | $ 1.58 | 4/11/15 | 0 | 100,000 | 0 | |
| **May 2, 2005** | | | | | | | | | | |
| Luan Dang | 50,000 | | Non-Stat | 2 | $ 1.49 | 5/2/15 | 37,500 | 12,500 | 0 | |

Exhibit 1, p.45

## Caneum Convertible Securities

| Name & Grant Date | Granted Number of Options | Granted Number of Warrants | Incent./ Non-Qual Non-Stat | Vesting Schedule | Exercise Price | Expiration Date | Vested Options | Unvested Options | Lapsed/ Cancelled Options | Exercised Options |
|---|---|---|---|---|---|---|---|---|---|---|
| Doug Weadkins  June 1, 2005 | 37,500 | | Non-Stat | 3 | $ 1.49 | 5/2/15 | 9,375 | 0 | 28,125 | 0 |
| Luan Dang | 200,000 | | Non-Stat | 3 | $ 1.40 | 6/1/15 | 50,000 | 150,000 | 0 | 0 |
| Steve Murphy  July 27, 2005 | 20,000 | | Non-Stat | 14 | $ 1.09 | 7/27/15 | 10,000 | 10,000 | 0 | 0 |
| Avtar Ranshi  August 14, 2005 | 50,000 | | Non-Stat | 2 | $ 1.11 | 8/14/15 | 25,000 | 25,000 | 0 | 0 |
| Andy Miller  November 16, 2005 | 150,000 | | Incentive | 12 | $ 0.71 | 11/16/15 | 0 | 150,000 | 0 | 0 |
| Roger Goulette  December 30, 2005 | 40,000 | | Non-Stat | 15 | $ 0.85 | 12/30/15 | 5,000 | 35,000 | 0 | |
| Roger Goulette | 10,000 | | Non-Stat | 15 | $ 0.85 | 12/30/15 | 1,250 | 8,750 | 0 | |
| Plan Grants for 2006 | | | | | | | | | | |
| Chris Deelsynder  March 22, 2006 | 40,000 | | Non-Stat | 15 | $ 0.83 | 3/22/16 | 0 | 40,000 | 0 | |
| **Warrants** | | | | | | | | | | |
| Eric Bronk  February 23, 2005 | | 50,000 | | | $ 0.75 | 10/28/08 | | | | |
| Steve Murphy  June 1, 2005 | | 25,000 | | | $ 1.40 | 6/1/10 | | | | |
| Ron Vance | | 25,000 | | | $ 1.40 | 6/1/10 | | | | |
| Offering October 1, 2005 | | 50,333 | | | $ 1.00 | 12/31/12 | | | | |
| Offering January 2, 2006 | | 233,336 | | | $ 1.00 | 3/31/13 | | | | |
| **TOTALS** | 5,020,000 | 383,669 | | | | | 4,061,710 | 861,415 | 96,875 | 365,454 |
| **Net Options Outstanding** | 4,557,671 | | | | | | | | | |

Exhibit 1, p.46

## Caneum Convertible Securities

| Name & Grant Date | Granted Number of Options | Granted Number of Warrants | Incent./ Non-Qual | Vesting Schedule | Exercise Price | Expiration Date | Vested Options | Unvested Options | Lapsed/ Cancelled Options | Exercised Options |
|---|---|---|---|---|---|---|---|---|---|---|
| Warrants Outstanding | | 383,669 | | | | | | | | |

1. (i) One-twelfth (1/12th) for the quarter ended June 30, 2003; (ii) one-twelfth (1/12th) for each quarter in which the gross revenue for such quarter exceeds the gross revenue of the prior quarter, and/or one-twelfth (1/12th) for each $250,000 in gross revenue generated cumulatively in the aggregate since inception of the company; (iii) immediately in the event of a Corporate Transaction, as defined in the 2002 Stock Option/Stock Issuance Plan; and, (iv) any unvested options outstanding at December 31, 2006, shall automatically vest at that time.

2. One-fourth (1/4th) of the total options granted at the end of each three-month period and immediately in the event of a Corporate Transaction, as defined in the 2002 Stock Option/Stock Issuance Plan.

3. One-twelfth (1/12th) of the total options granted at the end of each quarter and immediately in the event of a Corporate Transaction, as defined in the 2002 Stock Option/Stock Issuance Plan.

4. (i) One-twelfth (1/12th) each operating quarter in which the gross revenue for such quarter exceeds the gross revenue of the prior quarter, and/or one-twelfth (1/12th) for each $250,000 in gross revenue generated cumulatively in the aggregate since inception of the company; (ii) immediately in the event of a Corporate Transaction, as defined in the 2002 Stock Option/Stock Issuance Plan; and, (iii) any unvested options outstanding at December 31, 2006, shall automatically vest at that time.

5. (i) One-twelfth (1/12th) immediately; (ii) beginning with the operating quarter ending March 31, 2004, 1/12th shall vest each operating quarter in which the gross revenue for such quarter exceeds the gross revenue of the prior quarter, and/or 1/12th for each $250,000 in aggregate revenues from non-acquisition generated revenues; (iii) immediately in the event of a Corporate Transaction, as defined in the 2002 Stock Option/Stock Issuance Plan; and (iv) immediately at the three year six month anniversary of employment with Caneum.

6. 6,250 per $125,000 of new top line revenue that reporting person delivers to Caneum, with the lone requirement that it be profitable revenue in accordance with Caneum policies/guidelines; (i) immediately in the event of a Corporate Transaction, as defined in the 2002 Stock Option/Stock Issuance Plan; and (ii) immediately at the three year six month anniversary of employment with Caneum.

7. (i) One-twelfth (1/12th) each operating quarter in which the gross revenue for such quarter exceeds the gross revenue of the prior quarter, and/or one-twelfth (1/12th) for each $250,000 in gross revenue generated cumulatively in the aggregate since inception of the company; and (ii) immediately in the event of a Corporate Transaction, as defined in the 2002 Stock Option/Stock Issuance Plan.

8. (i) One-twelfth (1/12th) upon close of the Agreement and Plan of Merger with Pipeline Software, Inc.; (ii) starting with the quarter ending after the merger closing date, one-twelfth (1/12th) each operating quarter in which the gross revenue for such quarter exceeds the gross revenue of the prior quarter; (iii) one-twelfth (1/12th) for each $250,000 in aggregate revenue generated from non-acquisition generated revenues after merger closing date; and, (iv) any unvested options outstanding at the earlier of two years six months after the merger closing date or three years from date of grant shall automatically vest at that time.

9. One-fourth (1/4th) of the total options granted on the first day of each month following hire date and immediately in the event of a Corporate Transaction, as defined in the 2002 Stock Option/Stock Issuance Plan.

10. (i) Twelve-forty-eighths (12/48ths) of the total options granted at the end of the first year of employment; (ii) one-forty-eighth (1/48th) at the end of each month following the first year for a period of three years; and (iii) immediately in the event of a Corporate Transaction, as defined in the 2002 Stock Option/Stock Issuance Plan.

11. For a Vice-President, vesting is based upon new revenues delivered to the company from sales activities by reporting person, or team member reporting to reporting person, with the lone requirement that it be profitable revenue in accordance with Caneum policies/guidelines. New revenue would be reviewed for six (6) month periods on June 30 and December 31. Vesting would be based on new revenues, divided by $4,000,000 times total number of options granted. Any unvested options outstanding at the fifty-two (52) month anniversary of the grant, shall automatically vest at that time. Options would also vest in the event of a Corporate Transaction, as defined in the 2002 Stock Option/Stock Issuance Plan.

## Caneum Convertible Securities

Page 4 of 4

| Name & Grant Date | Granted Number of Options | Granted Number of Warrants | Incent./Non-Qual | Vesting Schedule | Exercise Price | Expiration Date | Vested Options | Unvested Options | Lapsed/Cancelled Options | Exercised Options |
|---|---|---|---|---|---|---|---|---|---|---|

12 (i) Twelve-forty-eighths (12/48ths) of the total options granted at the end of the one year; (ii) one-forty-eighth (1/48th) at the end of each month following the first year for a period of three years; and (iii) immediately in the event of a Corporate Transaction, as defined in the 2002 Stock Option/Stock Issuance Plan.

13 (i) One-twelfth (1/12th) of the options will vest immediately in recognition of the work done to help close first customer; (ii) remaining options will vest based upon new revenues delivered to the company from sales activities by optionee, or team member reporting to optionee, with the lone requirement that it be profitable revenue in accordance with Caneum policies/guidelines. New revenue will be reviewed every quarter. Vesting would be based on new revenues, divided by $4,000,000 times the total number of options granted. Any unvested options outstanding at the fifty-two (52) month anniversary of the grant, shall automatically vest at that time. Options would also vest in the event of a Corporate Transaction, as defined in the 2002 Stock Option/Stock Issuance Plan.

14 One-fourth (1/4th) of the total options will vest at the end of each QTR, provided that the service provider remains under contract and working for Caneum at the end of each QTR.

15 (i) One-eighth (1/8th) of the total options will vest at the end of each 90 day period, provided that the service provider remains Chairman of the Advisory Board for Caneum at the end of each 90 day period; and (ii) immediately in the event of a Corporate Transaction, as defined in the 2002 Stock Option/Stock Issuance Plan.

16 Vesting is performance based and is tied to generating $500,000 in revenue. Each quarter we divide the revenue attributed to that Advisor for the quarter by $500,000 to calculate the percentage of the stock grant that would vest for that quarter. Example = $100K in new revenues in a QTR would result in [($100K / $500K) * (40,000)] = 8,000 shares vested.

Preferred Stock Purchase Agreement
Dated March 24, 2006

Attachment 2

**Employment Agreements:**  The Company has employment agreements with the following individuals, each of which agreement provides for mandatory minimum annual bonus payable in Company securities or cash at the discretion of the Compensation Committee:  Alan Knitowski and Suki Mudan.

**Consulting Agreements:**  The Company entered into a consulting agreement with Robert Mitro in which the Company has agreed to pay $5,000 monthly compensation in shares of Common Stock.  This agreement expires on October 31, 2006.  The Company has also entered into an engagement letter with its legal counsel in which the Company has agreed to issue shares of Common Stock in an undetermined amount as compensation for legal services associated with this transaction in excess of $12,500.

**Outside Directors:**  The Company has adopted a compensation matrix for its outside directors payable in options from the Company's Stock Option/Stock Issuance Plan as described in the Company's SEC filings.

**Ascendiant Securities, LLC:**  As compensation payable in this transaction, the Company has agreed to issue to Ascendiant Securities, LLC ("Ascendiant") warrants equal to 8% of the securities issued to the Investor in this transaction at prices exercise equal to those of Investor and 60,000 shares for raising greater than a minimum of $1,500,0000 for the Company.

**Advisory Board:**  The Board appointed a new member of the Advisory Board at the regular meeting of the Board held on March 22, 2006, and the Compensation Committee has authorized the issuance of 40,000 shares to this person for such appointment.  The stock certificate representing these shares has not been yet issued and these shares are not included in the total outstanding shares set forth on Exhibit 4.3.2